O. PAUL SHEW *v.* FREEDOM OF INFORMATION
COMMISSION ET AL.
(SC 15707)

Callahan, C. J., and Borden, Berdon, Palmer and McDonald, Js.

150

Argued January 20—officially released June 23, 1998

*Victor R. Perpetua,* appellate attorney, with whom, on the brief, was *Mitchell W. Pearlman,* general counsel, for the appellant (named defendant).

*Felix J. Springer*, with whom was *Daniel A. Schwartz*, for the appellee (plaintiff).

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

*Opinion*

PALMER, J. The sole issue in this certified appeal is whether certain documents created by an attorney who had been retained by the town of Rocky Hill (town) to conduct an investigation of the town's police chief are subject to disclosure under the Freedom of Information Act, General Statutes § 1-7 et seq. The named defendant, freedom of information commission (commission), ordered the plaintiff, O. Paul Shew, the town manager of Rocky Hill (town manager),[1] to provide the defendant, Edward A. Peruta,[2] with access to certain interview reports created by attorney Elaine Stuhlman, who had been hired by the town to conduct an investigation of its police chief, Philip Schnabel. The trial court sustained the town manager's appeal from the commission's order requiring disclosure of the documents, and remanded the case for further proceedings before the commission. The Appellate Court affirmed the judgment of the trial court; *Shew* v. *Freedom of Information Commission*, 44 Conn. App. 611, 691 A.2d 29 (1997); and we granted the commission's petition for certification to appeal. *Shew* v. *Freedom of Information Commission*, 241 Conn. 914, 696 A.2d 340 (1997). Subject to a direction to modify the trial court's remand order, we affirm the Appellate Court's judgment.

The opinion of the Appellate Court sets forth the undisputed facts and procedural history. "[Shew] was the town manager of the town of Rocky Hill. From

---

[1] Shew is no longer Rocky Hill's town manager.

[2] Peruta has not appealed from the adverse judgments of the trial court and the Appellate Court.

December, 1991, to June, 1992, he conducted an investigation of . . . Schnabel to determine whether [Schnabel's] employment with the town should be terminated. To assist in the investigation, he hired attorneys Felix Springer and Elaine Stuhlman. Springer concentrated on reviewing the trial transcript and evidence in a civil tort case;[3] see *Schnabel* v. *Tyler,* 32 Conn. App. 704, 630 A.2d 1361 (1993), aff'd, 230 Conn. 735, 646 A.2d 152 (1994); because the jury verdict in that case raised serious concerns about whether Schnabel had abused the authority of his office. Stuhlman concentrated on interviewing town employees and other persons to determine whether there may have been evidence outside the trial record that Schnabel had abused his authority. Stuhlman also gave the town manager legal advice related to her findings. The town manager hired Springer and Stuhlman in an effort to avoid legal complications and because he thought that General Statutes § 7-278,[4] which provides statutory protection to police chiefs, necessitated legal counsel.

---

[3] "In 1988 . . . Schnabel . . . filed a defamation action against one of his officers, Clyde Tyler. Tyler counterclaimed against Schnabel in his official capacity, alleging false imprisonment, intentional infliction of emotional distress, violation of his constitutional rights to free speech and equal protection and abuse of process. The jury returned a verdict for Tyler on his counterclaims and awarded damages of $370,000, including punitive damages on each count." *Shew* v. *Freedom of Information Commission,* supra, 44 Conn. App. 613 n.5.

[4] General Statutes § 7-278 provides: "Hearing prior to dismissal of municipal police head. Just cause requirement. Appeal. No active head of any police department of any town, city or borough shall be dismissed unless there is a showing of just cause by the authority having the power of dismissal and such person has been given notice in writing of the specific grounds for such dismissal and an opportunity to be heard in his own defense, personally or by counsel, at a public hearing before such authority. Such public hearing, unless otherwise specified by charter, shall be held not less than five nor more than ten days after such notice. Any person so dismissed may appeal within thirty days following such dismissal to the superior court for the judicial district in which such town, city or borough is located. Service shall be made as in civil process. Said court shall review the record of such hearing, and, if it appears upon the hearing upon the appeal that

"From January to April, 1992, Stuhlman conducted interviews, prepared draft summaries of the interviews and prepared affidavits and a preliminary draft report based on the interviews. In April, 1992, Stuhlman forwarded summaries of the interviews together with affidavits to Springer. In June, 1992, Springer forwarded a report documenting Schnabel's actions to the town manager.[5]

"In December, 1993 . . . Peruta requested from the town manager access to all statements 'created and/or collected as part of an investigation that resulted in the termination of . . . Schnabel.' Specifically, Peruta sought access to Stuhlman's documents. The town manager denied Peruta's request, claiming that the requested documents were protected from disclosure by the attorney-client privilege. Peruta filed a complaint with the commission challenging the town manager's denial of access to those documents.

"Following a hearing and in camera review of the challenged documents, the commission found that the

testimony is necessary for an equitable disposition of the appeal, it may take evidence or appoint a referee or a committee to take such evidence as it directs and report the same to the court with his or its findings of fact, which report shall constitute a part of the proceedings upon which the determination of the court shall be made. The court, upon such appeal, and after a hearing thereon, may affirm the action of such authority, or may set the same aside if it finds that such authority acted illegally or arbitrarily, or in the abuse of its discretion, with bad faith, malice, or without just cause."

[5] At the hearing before the commission, Springer denied that, in preparing his report, he had relied on any of the information supplied by Stuhlman. He stated, instead, that his report derived exclusively from information contained in the trial transcript of Schnabel's civil case; see *Schnabel* v. *Tyler*, supra, 32 Conn. App. 704; and the evidence adduced in connection with that case. In addition, the town manager testified that he never had received "a finalized or formalized copy of any of the work that . . . Stuhlman did in the investigation . . . ." He indicated, rather, that he had been shown "some drafts of statements; they were on the back of scrap paper which had other nonrelevant things printed on the back of them," and, further, that Stuhlman had "apprised [him] orally of what was going on." Finally, the town manager was unable to recall whether he ever had a copy of the draft statements in his possession.

documents were public records. It found that Stuhl-man's documents were not exempt from disclosure under General Statutes § 1-19 (b) (1) as 'preliminary drafts or notes' and that the documents were not protected by the attorney-client privilege pursuant to § 1-19 (b) (10).[6] The commission ordered the town manager to make the documents available to Peruta in accordance with § 1-19 (a).[7] The commission's decision regarding the 'preliminary drafts or notes' exception was based on its interpretation of the statutory language to mean only documents that are used in the creation of some subsequent, finished document. It found that the Stuhlman documents were essentially products themselves, not 'preliminary' to anything developed from them and, therefore, were not exempt. The commission also rejected the claimed attorney-client privilege, finding that Stuhlman was neither hired nor acting as an attorney for the plaintiff, but was acting as 'an investigator with legal credentials.'

"The town manager appealed to the trial court pursuant to General Statutes § 4-183, claiming that the Stuhlman documents were protected against disclosure by the attorney-client privilege and exempt under § 1-19 (b) (10) and were 'preliminary drafts or notes' and exempt under § 1-19 (b) (1).

[6] General Statutes § 1-19 provides in relevant part: "Access to public records. Exempt records. (a) Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to inspect such records in accordance with the provisions of section 1-15. . . .

"(b) Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be construed to require disclosure of (1) preliminary drafts or notes provided that the public agency has determined that the public interest in withholding such documents clearly outweighs the public interest in disclosure . . . (10) . . . communications privileged by the attorney-client relationship . . . ."

[7] See footnote 6 of this opinion.

"The trial court held that the commission improperly found that the attorney-client privilege did not exist. It also disagreed with the commission's conclusion that the privilege should not prevent disclosure of the Stuhlman documents because they are not the kind of communication that the privilege protects. While the trial court found impropriety in the commission's finding that the privilege did not apply to the communications in question, it also found that the commission failed to make further findings concerning the criteria set out in *Upjohn Co.* v. *United States,* 449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). Therefore, the trial court remanded the case to the commission for that purpose.[8]

"The trial court also found that the commission's conclusion that the documents in question were not preliminary drafts or notes within the meaning of § 1-19 (b) (1) was improper. The trial court remanded the case to the commission to make findings, as required by § 1-19 (b) (1), as to whether the town manager properly determined that the public interest in withholding the documents outweighed the public interest in their disclosure." *Shew* v. *Freedom of Information Commission,* supra, 44 Conn. App. 613–16.

On appeal to the Appellate Court, the commission claimed that the trial court improperly: (1) "substituted its judgment for that of the [commission]" in determining that Stuhlman had been acting as an attorney, rather than as an investigator; (2) "concluded that the attorney-client privilege barred disclosure of [the] documents"; and (3) "concluded that the . . . documents were not [subject to disclosure] pursuant to . . . § 1-19 (c) (1)."[9] Id., 613. The Appellate Court concluded

---

[8] Specifically, the trial court ordered the commission to determine: (1) "which individuals interviewed by . . . Stuhlman were employees or officials of the town . . . at the time of the interviews"; and (2) "whether the Stuhlman interviews were conducted individually in confidence."

[9] General Statutes § 1-19 (c) provides in relevant part: "Notwithstanding the provisions of [subdivision] (1) . . . of subsection (b) of this section

that "all of the relevant evidence in the record supports the trial court's conclusion that the town manager hired Stuhlman for legal advice." Id., 617. The court also determined that, in accordance with the criteria set forth in *Upjohn Co.* v. *United States,* supra, 449 U.S. 394–95, concerning the application of the attorney-client privilege in the corporate context, and subject to the factual determinations on remand; see footnote 8; the documents are protected from disclosure as privileged attorney-client communications pursuant to § 1-19 (b) (10). *Shew* v. *Freedom of Information Commission,* supra, 44 Conn. App. 620–21. Finally, the court rejected the commission's claim that, because Stuhlman was not "a member of the staff of a public agency"; General Statutes § 1-19 (c) (1); the documents must be disclosed. *Shew* v. *Freedom of Information Commission,* supra, 621–22. The court instead concluded that, because Stuhlman's role in the investigation was "analogous" to that of a staff member, she came within the purview of the statute. Id., 622. Consequently, the Appellate Court affirmed the judgment of the trial court. Id.

We granted the commission's petition for certification to appeal limited to the following two questions: (1) "Did the Appellate Court properly conclude that the communications by town employees to Attorney Stuhlman were covered by the attorney-client privilege, subject to the factual determinations required by *Upjohn Co.* v. *United States,* [supra, 449 U.S. 383]?" and (2) "Did the Appellate Court properly conclude that the documents in question were preliminary drafts or

[i.e., General Statutes § 1-19 (b) (1); see footnote 6 of this opinion], disclosure shall be required of (1) interagency or intra-agency memoranda or letters, advisory opinions, recommendations or any report comprising part of the process by which governmental decisions and policies are formulated, *except disclosure shall not be required of a preliminary draft of a memorandum, prepared by a member of the staff of a public agency, which is subject to revision prior to submission to or discussion among the members of such agency . . . .*" (Emphasis added.)

notes within the meaning of General Statutes § 1-19 (b) (1)?" *Shew* v. *Freedom of Information Commission,* supra, 241 Conn. 914. We conclude that, subject to further factual determinations, the documents are exempt from disclosure, both as privileged attorney-client communications and as "preliminary drafts and notes."[10]

## I

The commission first claims that the Appellate Court improperly concluded that the communications by town employees to Stuhlman are protected by the attorney-client privilege. We disagree.

The opinion of the Appellate Court sets forth the well established legal principles governing privileged communications between attorney and client: "[W]here legal advice of any kind is sought from a professional legal adviser in his [or her] capacity as such, the communications relating to that purpose, made in confidence by the client, are at [the client's] instance permanently protected from disclosure by [the client] or by the legal adviser, except the protection may be waived. [*Rienzo* v. *Santangelo,* 160 Conn. 391, 395, 279 A.2d 565 (1971);] *LaFaive* v. *DiLoreto,* 2 Conn. App. 58, 65, 476 A.2d 626, cert. denied, 194 Conn. 801, 477 A.2d 1021 (1984). The privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him [or her] to give sound and informed advice. *Upjohn Co.* v. *United States,* supra, 449 U.S. 390. We note, however, that since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures—necessary to obtain informed legal advice—which might not have been made

---

[10] We consider both issues on appeal in light of the possibility that, on remand, it will be determined that one of the statutory exemptions from disclosure does not apply to one or more of the documents.

absent the privilege. . . . *Fisher* v. *United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976). *Ullmann* v. *State*, 230 Conn. 698, 713, 647 A.2d 324 (1994)." (Internal quotation marks omitted.) *Shew* v. *Freedom of Information Commission*, supra, 44 Conn. App. 618–19.

Although we have not previously considered whether the attorney-client privilege protects communications in circumstances where the client is a corporate or municipal entity, rather than an individual, we conclude that, for the reasons set forth in the opinion of the Appellate Court; id., 619–20; it does protect such communications.[11] Moreover, we adopt the test employed by

[11] The Appellate Court explained: "In *Upjohn Co.* v. *United States*, supra, 449 U.S. 383, the United States Supreme Court addressed the problem of the attorney-client privilege in the corporate context. *Upjohn Co.* involved an investigation, organized by Upjohn's general counsel, into possibly illegal payments made by the corporation to foreign governments. As part of the investigation, the attorneys prepared a questionnaire that was sent to all foreign general and area managers, inquiring about payments from Upjohn to any employee or official of a foreign government. Subsequently, the Internal Revenue Service issued a summons demanding production of files pertaining to the investigation, including the questionnaires prepared for counsel and answered by the various corporate managers. The . . . [c]ourt noted that a letter attached to the questionnaire stated that the investigation was under the direction of counsel, responses were highly confidential, and the completed questionnaires should be returned to counsel.

"In determining if the privilege attached, the . . . [c]ourt considered whether (1) the communication was part of a corporate purpose to obtain legal advice, (2) the communication concerned matters within the employees' corporate duties, (3) each employee knew that he [or she] was making a confidential statement as part of a corporate purpose to secure legal advice, and (4) the statements were kept confidential, or disclosed in a manner consistent with the privilege. *Upjohn Co.* v. *United States*, supra, 449 U.S. 394–95. The court held that the attorney-client privilege protected the questionnaires and any notes on responses to interview questions from disclosure.

"It is axiomatic that the privilege belongs to the client. See *In re Sean H.*, 24 Conn. App. 135, 143, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991). In the case of an individual client, the provider of the information and the person who acts on the attorney's advice are one and the same. In the corporate-municipal government context, however, it will frequently be not only officers and agents—those who fall easily under the

the Appellate Court to determine whether the privilege applies in the factual circumstances of a particular case. Accordingly, we conclude that "communications to an attorney for a public agency are protected from disclosure by privilege if the following conditions are met: (1) the attorney must be acting in a professional capacity for the agency, (2) the communications must be made to the attorney by current employees or officials of the agency,[12] (3) the communications must relate to the legal advice sought by the agency from the attorney, and (4) the communications must be made in confidence."[13] Id., 620–21.

attorney-client privilege umbrella—but employees who possess the information needed by the lawyer. By limiting the privilege to officers and agents of the corporation or municipality, we frustrate the purpose of the privilege by discouraging the communication of relevant information by employees to attorneys seeking to render legal advice to the client corporation or municipality. See *Upjohn Co.* v. *United States*, supra, 449 U.S. 392." *Shew* v. *Freedom of Information Commission*, supra, 44 Conn. App. 619–20.

[12] With respect to the second factor, the court in *Upjohn Co.* v. *United States*, supra, 449 U.S. 394 n.3, declined to decide whether the communication must be made by a *current* employee for it to be protected from disclosure by the attorney-client privilege. The Restatement of the Law Governing Lawyers, however, has adopted this requirement as a general rule. Restatement (Third), Law Governing Lawyers § 123 (2), pp. 386–87 (Proposed Final Draft No. 1, 1996). The commentary to § 123 (2) provides that "a person making a privileged communication to a lawyer for an organization must then be acting as agent of the principal-organization. The objective of the organizational privilege is to encourage the organization to have its agents communicate with its lawyer." Id., comment (e), p. 392. Because we agree with the rationale underlying the rule espoused by the Restatement, we, like the Appellate Court, adopt this rule.

The commentary further provides that "[a] *former* agent is a privileged person under Subsection (2) [of § 123] if, at the time of communicating, the former agent has a continuing legal obligation to the principal-organization to furnish the information to the organization's lawyer. The scope of such a continuing obligation is determined by the law of agency and the terms of the employment contract . . . ." (Citations omitted; emphasis added.) Id. Because this provision represents a logical extension of the general rule and is consistent with the rationale underlying that rule, we adopt it also.

[13] These conditions, while differing in minor respects from the factors relied upon by the United States Supreme Court in *Upjohn Co.* v. *United States*, supra, 449 U.S. 394–95; see footnote 11 of this opinion; are, as the Appellate Court noted, fully consistent with the teachings of that case. *Shew*

The Appellate Court properly concluded that the first and third conditions, namely, that Stuhlman was acting in her capacity as an attorney and that the communications related to the legal advice the town sought from her, were met. Id., 617–18, 620. With respect to the first factor, we agree with the Appellate Court that "all of the relevant evidence in record supports the trial court's conclusion that the town manager hired Stuhlman for legal advice. The record reveals that the town manager stated that he needed legal advice in the investigation of [Schnabel], that he knew Stuhlman was a competent attorney, and that he would not have hired her if she had not been an attorney. The town manager further stated that he felt that an attorney was required to conduct the interviews concerning [Schnabel] because of the statutory protections afforded [Schnabel] by § 7-278 and to avoid legal complications with regard to potential disciplinary matters relating to [Schnabel]. In contrast, there is no evidence in the record that Stuhlman was not acting in a legal capacity." Id., 617–18.

With respect to the third condition, the Appellate Court stated that "information, not available to upper level management—the town manager—was needed to supply a basis for legal advice concerning compliance with legalities involved in the possible termination of [Schnabel]." Id., 620. Inasmuch as the information contained in the affidavits and summarized by Stuhlman related directly to the activities and conduct of Schnabel and the issue of his possible termination, we agree with the Appellate Court that this condition has been satisfied.

The commission, however, made no findings concerning the other two requirements, namely, whether

v. *Freedom of Information Commission,* supra, 44 Conn. App. 620. We note, moreover, that the commission does not challenge the test as formulated, but instead claims that the communications are not privileged under that test.

the persons interviewed were employees or officials of the town at the time of the interviews, and whether the communications were made in confidence. Consequently, a remand for further factual findings by the commission with regard to these questions is necessary.[14]

The commission contends that, notwithstanding the foregoing analysis, because the town manager has failed to establish that the communications "might not have been made absent the privilege"; (internal quotation marks omitted) *Ullmann* v. *State*, supra, 230 Conn. 713; the privilege does not protect the communications at issue. This argument is unavailing.

[14] The commission claims that, even if it is determined on remand that the interviews were conducted in confidence, the privilege may not be invoked because the town manager had no expectation that the interviewees' communications to Stuhlman would be privileged from disclosure. In support of this claim, the commission relies, first, on the town manager's testimony before the commission in which he denied that he had hired Stuhlman so that her communications with town employees would be shielded from disclosure. Second, with respect to those communications that were reduced to affidavit form, the commission asserts that the use of such affidavits conclusively establishes that the town manager intended to offer them as evidence in a subsequent legal proceeding, thereby vitiating any claim that he expected that the statements would be privileged. We are not persuaded by either of these arguments.

First, the existence of the privilege does not necessarily turn on whether corporate management anticipates invoking the attorney-client privilege at some later date. Second, assuming, as the commission appears to argue, that the town manager and the interviewees must have intended that the communications would be confidential for the privilege to apply, we fail to see how the town manager's testimony that he did not hire Stuhlman *for the express purpose of* protecting the fruits of her investigation from disclosure has any bearing on the very different question of whether he expected that the information she gathered would be retained in confidence. Third, the mere fact that information provided by some of the interviewees had been reduced to affidavit form does not, without more, establish that the town manager reasonably could not have had a legitimate expectation of confidentiality with respect to those communications. Moreover, the commission's claim that the town manager intended to use the affidavits in some public forum is entirely without support in the record. The record is likewise devoid of any evidence that the affidavits were used in any proceeding, or that their confidentiality has not, at all times, been maintained.

First, we never have conditioned the invocation of the attorney-client privilege on a showing that the information might not have been communicated without the privilege; see, e.g., *Rienzo* v. *Santangelo*, supra, 160 Conn. 395 (privilege applies to confidential communications relating to legal advice sought from legal professional acting in that capacity); nor do we agree that *Ullmann* compels such a showing. The quoted language in *Ullmann* appears, instead, in the context of our discussion of quite a different question, namely, whether the disclosure was of the kind necessary to obtain legal advice. Quoting from *Fisher* v. *United States*, supra, 425 U.S. 403, we observed that the privilege "protects only those disclosures—*necessary to obtain informed legal advice*—which might not have been made absent the privilege." (Emphasis in original; internal quotation marks omitted.) *Ullmann* v. *State*, supra, 230 Conn. 713.[15] We concluded that, because the information was not "inextricably linked to the giving of legal advice," it was not protected by the privilege. Id., 714. Second, even assuming, arguendo, that the privilege may be invoked only when it is established that the information might not have been communicated absent the privilege, the record is devoid of any evidence tending to support the commission's assertion that the disclosures would have been made irrespective of the protection of the privilege. Consequently, this claim must fail.

We also are not persuaded that, as the commission argues, the availability of the privilege in the corporate context is limited to factual circumstances in which either the corporate entity or the employees providing the information face potential liability as a consequence

[15] Moreover, the pertinent discussion in *Fisher* v. *United States*, supra, 425 U.S. 403–404, focused on whether certain documents that were discoverable while in the client's possession nevertheless were protected from disclosure after the client had transferred them to his attorney. The court concluded that, under those circumstances, the privilege did not apply. Id., 404.

of the information communicated. See *Upjohn Co.* v. *United States,* supra, 449 U.S. 394–95. First, although we find the reasoning in *Upjohn Co.* to be persuasive authority for the test we adopt today, we are not bound by that decision as a matter of state common law. Second, and more importantly, we discern nothing either in the policy underlying *Upjohn Co.* or in the language employed therein that would justify such a narrow reading of that case. Finally, even if we agreed with the commission's claim, the record does not provide a sufficient factual basis to support it. Although the principal purpose for Stuhlman's investigation was to examine Schnabel's conduct rather than to uncover unlawful conduct on the part of the town or the employees who were interviewed, the town manager testified at the commission hearing that he "[had] to have competent legal counsel review what the town's role is . . . and to see if [the town has] liability." With respect to the employees, the record contains no evidence tending to establish whether, or to what extent, any of the interviewees feared liability as a result of the information they provided to Stuhlman.

## II

The commission also claims that the Appellate Court improperly determined that the documents constitute "preliminary notes or drafts" under § 1-19 (b) (1).[16] We also disagree with this contention.

---

[16] The town manager contends that our consideration of this certified question is inappropriate because: (1) the commission abandoned this claim by failing to raise it in the Appellate Court and in its certification petition; and (2) the Appellate Court opinion contains no discussion of whether the documents are "preliminary notes or drafts" within the meaning of § 1-19 (b) (1). We disagree. First, we are aware of no limitation on our authority to grant certification on an issue not expressly raised in a petition for certification. Second, we are persuaded that this issue implicitly was decided by the Appellate Court in the course of its determination as to whether the documents were "preliminary drafts" within the meaning of § 1-19 (c) (1). See footnote 9 of this opinion.

We previously have interpreted the phrase "preliminary notes or drafts" within the meaning of § 1-19 (b) (1). *Van Norstrand* v. *Freedom of Information Commission*, 211 Conn. 339, 342–44, 559 A.2d 200 (1989); *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 331–33, 435 A.2d 353 (1980).[17] Examining, first, the common meaning of the words contained in this phrase, we observed that " '[p]reliminary' is defined as 'something that precedes or is introductory or preparatory.' As an adjective it describes something that is 'preceding the main discourse or business.' A 'draft' is defined as 'a preliminary outline of a plan, document or drawing . . . .' American Heritage Dictionary of the English Language. By using the nearly synonymous words 'preliminary' and 'draft,' the legislation makes it very evident that preparatory materials are not required

---

[17] *Van Norstrand* involved a request under the Freedom of Information Act for the disclosure of a report containing the results of a survey evaluating the performance of various judges, only some of whom were, at the time, under consideration for reappointment. *Van Norstrand* v. *Freedom of Information Commission*, supra, 211 Conn. 340–41. The information concerning the judges who then were not being considered for reappointment had been collected for the sole purpose of establishing the statistical validity of the survey. Id., 341. The speaker of the state House of Representatives released the report to a newspaper only after excising the data on those judges who were not, at the time, under consideration for reappointment. Id. The commission ordered disclosure, and the trial court reversed. Id., 341–42. We affirmed the judgment of the trial court, concluding that, because the excised data were "not required or germane to the eventual purpose for which the survey was undertaken," they were preliminary within the meaning of § 1-19 (b) (1). Id., 343.

Citing to *Van Norstrand*, the commission suggests that only information that is shown to be *irrelevant* to the ultimate purpose for which it is gathered may be considered to be preliminary for purposes of § 1-19 (b) (1). The commission argues that, because the information Stuhlman collected was relevant to whether Schnabel should be terminated, even though it was not considered in making that determination, it is not preliminary within the meaning of § 1-19 (b) (1). We are not persuaded. Consistent with our holding in *Van Norstrand*, we conclude that, although relevancy may be considered when determining whether a document is preliminary, even relevant material, if incorporated into an unfinished document or one which is, for all purposes, predecisional, is not disclosable. See id., 343–44.

to be disclosed." *Van Norstrand* v. *Freedom of Information Commission*, supra, 343. Furthermore, "the concept of preliminary, as opposed to final, should [not] depend upon . . . whether the actual documents are subject to further alteration." *Wilson* v. *Freedom of Information Commission*, supra, 332. "[P]reliminary drafts or notes reflect that aspect of the agency's function that precedes formal and informed decisionmaking. . . . It is records of this preliminary, deliberative and predecisional process that we conclude the exemption was meant to encompass." Id., 332–33.

Applying these principles to the instant case, we conclude that the documents are "preliminary drafts or notes" within the meaning of § 1-19 (b) (1). As the trial court observed, "Stuhlman's report . . . with its 'conclusion' section left completely blank, can be nothing but a 'preliminary draft or note' under any definition of those terms." Moreover, the interview summaries and affidavits, although final in form, also are preliminary because they were created solely to serve as supporting documentation for Stuhlman's unfinished report.[18]

Documents that qualify for the § 1-19 (b) (1) exemption nonetheless may be disclosable under § 1-19 (c) (1) if they constitute "interagency or intra-agency memoranda or letters, advisory opinions, recommendations or any report comprising part of the process by which governmental decisions and policies are formulated . . . ." General Statutes § 1-19 (c) (1). The disclosure provisions of § 1-19 (c) (1) are qualified, however, in that "disclosure shall not be required of a preliminary draft of a memorandum, prepared by a member of the staff of a public agency, which is subject to revision

---

[18] Indeed, because the report itself was preliminary and therefore subject to revision, at least some of the documents Stuhlman created may have been revised or even deleted from the report.

prior to submission to or discussion among the members of such agency . . . ." General Statutes § 1-19 (c) (1).[19]

We agree with the Appellate Court that § 1-19 (c) (1) does not mandate disclosure of the documents in this case.[20] Focusing on Stuhlman's role in the investigation, the Appellate Court observed that, "[a]lthough the trial court did not make an express finding that Stuhlman was a 'member of the staff of a public agency,' she was hired by the town to provide legal advice. Stuhlman's role as legal advisor for the Schnabel investigation was analogous to being a staff member as required by § 1-19 (c) (1). Thus, the trial court properly concluded that the documents were exempt from disclosure." *Shew* v. *Freedom of Information Commission,* supra, 44 Conn. App. 622. Although, as the commission argues, the statutory language "member of the staff" may be interpreted to limit the applicability of § 1-19 (c) (1) to employees of a public agency, "[b]ecause our fundamental objective in construing a statute is to ascertain and give effect to the apparent intent of the legislature . . . we will not undertake an examination of [a statute] with blinders on regarding what the legislature intended [it] to mean. . . . Accordingly, our analysis of [a statute] is not limited solely to the words of the statute. Instead, we must

[19] The town manager contends that, because we refused to grant the commission's request for certification on the question of whether § 1-19 (c) (1) applies to the documents, we should decline to consider it now. Because § 1-19 (c) (1), by its terms, expressly limits the scope of the exemption from disclosure under § 1-19 (b) (1), we conclude that our consideration of § 1-19 (c) (1) is necessary to our resolution of the second certified question.

[20] At oral argument, the town manager asserted for the first time that § 1-19 (c) (1) does not apply to the documents because he had never examined them and, consequently, they could not constitute "part of the process by which governmental decisions and policies are formulated." General Statutes § 1-19 (c) (1). Because this claim was not briefed by either party, we decline to consider it. See, e.g., *Peerless Ins. Co.* v. *Gonzalez,* 241 Conn. 476, 486 n.7, 697 A.2d 680 (1997).

also look . . . to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation . . . ." (Citations omitted; internal quotation marks omitted.) *Derwin* v. *State Employees Retirement Commission*, 234 Conn. 411, 420, 661 A.2d 1025 (1995). We discern no reason, consistent with the purposes underlying the statute, to conclude that our legislature intended to exclude from § 1-19 (c) (1) drafts of memoranda prepared by persons who, like Stuhlman, are hired on a contractual basis to perform tasks that are, for all relevant purposes, indistinguishable from those which may be performed by agency personnel.

Notwithstanding our conclusion that the documents constitute "preliminary drafts or notes" within the meaning of § 1-19 (b) (1) and, further, that they otherwise are not disclosable under § 1-19 (c) (1), the case must be remanded for a determination by the town as to whether "the public interest in withholding such documents clearly outweighs the public interest in disclosure . . . ." General Statutes § 1-19 (b) (1).[21] It is undisputed that the town manager never reviewed the documents; consequently, he could not have conducted the balancing test mandated by the statute. Therefore, to the extent that the trial court remanded the case for a determination as to "*whether* the [town manager] determined that the public interest in withholding the Stuhlman documents from disclosure outweighed the public interest in disclosure"; (emphasis added); the Appellate Court is hereby directed to modify the trial court's remand order to require the town to make such a determination.[22]

---

[21] Of course, this balancing test need not be conducted with regard to those documents that are determined to be exempt from disclosure under the attorney-client privilege.

[22] In conducting the balancing test, "the agency may not abuse its discretion in making the decision to withhold disclosure. The agency must, there-

The judgment of the Appellate Court is affirmed, and the case is remanded to that court with direction to remand the case to the trial court, with direction to remand the case to the commission for further proceedings consistent with this opinion.

In this opinion the other justices concurred.

fore, indicate the reasons for its determination to withhold disclosure and those reasons must not be frivolous or patently unfounded. *Wilson* v. *Freedom of Information Commission,* supra, [181 Conn.] 339." (Internal quotation marks omitted.) *Van Norstrand* v. *Freedom of Information Commission,* supra, 211 Conn. 345.