[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an administrative appeal from a decision of the defendant, freedom of information commission (FOIC), brought pursuant to General Statutes §§ 1-206 (d) and 4-183 (a).[1] The plaintiffs, the Coalition to Save Horsebarn Hill (coalition), Ainslie Gilligan (Gilligan) and Richard L. Sherman (Sherman), requested access to documents pertaining to a now-canceled UConn-Pfizer, Inc. (Pfizer) joint project for the construction of a vaccine research center at the university's Storrs campus. Initially, the defendant, the University of Connecticut (UConn) denied the request. Subsequently, in a final decision, the FOIC, acting under its authority pursuant to General Statutes § 1-206 (b)(2), confirmed UConn's denial of the plaintiffs' requests and dismissed their appeal from that denial. The plaintiffs now seek review of the FOIC's decision. Also named as defendants are the office of the attorney general, assistant attorney general Paul Shapiro, the assistant executive secretary of the board of trustees, Susan A. Locke (Locke), and the board of trustees of UConn (board).
 PROCEDURAL HISTORY
The FOIC's final decision was mailed on November 3, 1999. (ROR, p. 125.) The plaintiffs filed this appeal on December 6, 1999. In their answer filed April 5, 2000, four of the defendants — Shapiro, the office of the attorney general, Locke and the board — raise as a special defense that this court lacks jurisdiction because the plaintiffs are not aggrieved by the FOIC's final decision and have not alleged aggrievement in their complaint. The defendant FOIC raises no special defense in its answer filed on the same date.
 FACTS
The following facts are not in dispute. On April 3, 1998, the board authorized the university's administration to "enter into agreements with Pfizer, Inc. for the construction of a Center for Excellence in Vaccine Research, located on Horsebarn Hill Road." (ROR, p. 80.) Essential elements of the agreements included (1) a land lease, (2) construction of the facility by Pfizer with full design participation by UConn, (3) a leaseback of twenty percent of the facility to UConn for nominal consideration, and (4) management of the entire facility by UConn, under a separate management contract with Pfizer. (ROR, 80.) While there is some dispute among the parties as to who produced the first draft, it is CT Page 9136 uncontroverted that after the board's authorization, Pfizer and UConn exchanged various drafts of the proposed agreements;[2] (ROR, pp. 56-58); until the project was canceled sometime in August of 1999. (ROR, pp. 70, 114.) On April 5, 1999, Gilligan telephoned the offices of the board and spoke to Locke, requesting agreements entered into by UConn and Pfizer. (ROR, pp. 46-47.) The request yielded only the authorization letter dated April 3, 1998. (ROR, pp. 46-47, 131-32.) Meanwhile, in early April of 1999, Sherman contacted state Senator Edith Prague (Prague) and told her of his concerns regarding the proposed project, asking for her assistance in obtaining the documents. (ROR, pp. 36-37.) Prague then orally requested access to any contract documents pertaining to the UConn-Pfizer project (ROR, p. 37) from assistant attorney general Paul Shapiro (Shapiro), who retains copies of the documents (ROR, pp. 57-58.) The request was denied. (ROR, p. 37.) The plaintiffs then appealed UConn's decision to withhold the information to the FOIC, alleging that the defendants violated the Freedom of Information Act by denying them access to the requested agreements. (ROR, pp. 7, 133.) The plaintiffs' claims were consolidated upon appeal. (ROR, p. 23.) On May 24, 1999, the plaintiffs also submitted a written request for the documents to the president of UConn, Dr. Philip E. Austin. (ROR, p. 82.) In a letter dated May 26, 1999, Shapiro, responding on behalf of the University, denied the written request.[3] (ROR, p. 83.) On June 2, 1999, the matter was heard as a contested case before commissioner Norma Riess, the hearing officer for the case. (ROR, p. 23.)
The hearing officer made the following findings in her report: The defendants are public agencies within the meaning of General Statutes § 1-200 (1). (ROR, p. 117.) The defendants maintain working drafts of agreements and these draft agreements are public records within the meaning of General Statutes § 1-210 (a). (ROR, p. 118.) The draft agreements maintained by the respondents constitute "preliminary drafts" within the meaning of General Statutes § 1-210 (b)(1) (formerly § 1-19 (b)(1)). (ROR, p. 119.) The defendants have determined that the public interest in withholding the draft agreements clearly outweighs the public interest in disclosure within the meaning of § 1-210 (b) (1).[4] (ROR, p. 119.) Therefore, the report concludes, the requested draft agreements are exempt from disclosure under § 1-210 (b)(1)[5]
and the defendants did not violate § 1-210 (a) by refusing to provide the complainants with the requested draft agreements. (ROR, p. 119.)
The plaintiffs subsequently filed two separate motions to reopen the hearing. In the first motion to reopen, dated August 12, 1999, the plaintiffs raised the issue of the project's abandonment. (ROR, p. 174.) In the second motion to reopen, dated September 14, 1999, the plaintiffs raised the issue of Riess' alleged conflict of interest. (ROR, pp. 176-79.) The plaintiffs again raised both issues when they filed their CT Page 9137 exceptions to the proposed final decision in October 25, 1999. (ROR, p. 189.) In its final decision dated October 27, 1999, the FOIC adopted in full the hearing officer's report. (ROR, pp. 126-29.)
On appeal, the plaintiffs have again raised the two issues they presented to the FOIC in their motions to open and in their exceptions to the proposed final decision. First, they claim that the withheld documents no longer qualify for an exemption under § 1-210 (b)(1) because the UConn-Pfizer project has since been abandoned, so the documents in question are no longer preliminary drafts and the public interest no longer weighs in favor of nondisclosure as required by §1-210 (b)(1). Second, they allege that the hearing officer, Norma Riess, should have recused herself because of a conflict of interest.
 JURISDICTION
Generally, a trial court has jurisdiction under the Uniform Administrative Procedure Act (UAPA) over an appeal from the decision of an administrative agency if the plaintiffs are aggrieved parties for purposes of § 4-183 (a), if they have met the exhaustion requirement and if the appeal was filed in a timely manner. The defendants allege that the plaintiffs have not satisfied the aggrievement requirement and they further allege that the plaintiffs have failed to satisfy a jurisdictional requirement that is specific to the Freedom of Information Act (FOIA) — that the original request to the administrative agency, in this case UConn, be in writing. Because the court finds that the plaintiffs satisfy all the jurisdictional requirements, both of the UAPA and the FOIA, the court finds that it has jurisdiction over this appeal.
Courts apply a two-part test to determine whether a plaintiff is aggrieved by an agency decision. This test requires a showing of: "(1) a specific personal and legal interest in the subject matter of the [commission's] decision; and (2) a special and injurious effect on this specific interest." State Library v. Freedom of Information Commission,240 Conn. 824, 832, 694 A.2d 1235 (1997). "Aggrievement is established if there is some possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." Id., 834. "[A] plaintiff may prove aggrievement by relying on facts established in the record as a whole, including the administrative record." Id., 832. General Statutes § 1-210 (a) grants members of the public the right to copy or inspect "all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation." The plain language of this statute means that members of the public have a legally protected interest in nonexempt records that fall under § 1-210. In order to show aggrievement under CT Page 9138 § 1-210, then, the plaintiffs must make two showings. First they must show that they have a good faith belief that they are entitled to access to the records under § 1-210. Wildin v. Freedom of InformationCommission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 572290 (Jun. 17, 1998, DiPentima, J.) (22 Conn.L.Rptr. 293, 294). Second, they must show that they have been denied access to the records. Id. Therefore, the plaintiffs' claim that they were entitled to disclosure of the documents under General Statutes § 1-210, coupled with UConn's refusal to provide the documents, satisfies the aggrievement requirement.
Under the exhaustion of administrative remedies doctrine, "the Superior Court has jurisdiction only over appeals from a final decision of an administrative agency." (Internal quotation marks omitted.) Ahern v.State Employees Retirement Commission, 48 Conn. App. 482, 487,710 A.2d 1366, cert. denied, 245 Conn. 911, 718 A.2d 16 (1998), citing toState v. State Employees' Review Board, 231 Conn. 391, 400 n. 13,650 A.2d 158 (1994). Since this is an appeal from a final decision of the FOIC and because the plaintiffs have no alternative remedy within the agency, the plaintiffs have satisfied the exhaustion requirement.
Finally, the appeal was filed in a timely manner. General Statutes § 4-183 (c) requires that a party appeal within forty-five days after the mailing of the final decision. The final decision in this case was mailed on November 3, 1999 (ROR, p. 125), and the plaintiffs filed this appeal on December 6, 1999, well within the statutory limit. Therefore, the plaintiffs have satisfied the general jurisdictional requirements of the UAPA.
At oral argument before this court on April 17, 2001, the defendants claimed that the FOIC lacked jurisdiction to hear the plaintiffs' appeal because the plaintiffs never made written requests for copies of the documents, and thus, that the court now lacks jurisdiction.[6] In the absence of a written request, the defendants argue, there was no denial under General Statutes § 1-206 (b)(1).[7] (ROR, p. 100.) Contrary to the defendants' argument, however, the oral form of the plaintiffs' earlier requests do not present a jurisdictional bar to the plaintiffs' appeal. Two sections of the FOIA are relevant in resolving this jurisdictional challenge. General Statutes § 1-212 (a) states that "[a]ny person applying in writing shall receive, promptly upon request, a plain or certified copy of any public record." (Emphasis added.) General Statutes § 1-210 provides that "every person shall have the right to inspect such records promptly . . . or to receive a copy of such records in accordance with the provisions of section 1-212." In the past, the commission has interpreted this cross referencing to mean that "one can receive a copy of a record by applying in writing under [§ 1-212
CT Page 9139 (a)], or by just requesting to inspect a record under [§ 1-210]. commission's position is that if the legislature intended to require written requests to inspect, it clearly could have so provided because it mandated that procedure for copies of records. Therefore the commission believes that the statute prohibits the requirement of written requests to inspect records." Department of Public Safety v. Freedom ofInformation Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 700791 (February 5, 1992, Steinberg, J.) (7 C.S.C.R. 286), aff'd, 29 Conn. App. 821, 618 A.2d 565 (1993); but seeCosgrove v. Freedom of Information Commission, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 057156 (July 29, 1998, Coppeto, J.) (reversing the commission's decision ordering the agency to provide copies of the documents sought because, inter alia, the request was not in writing). Since, in this case, the commission found merely that the plaintiffs requested "access" to the documents, such a broad request may be interpreted as a request to inspect. (ROR, 126.) Therefore, the absence of a written request does not deprive the court of jurisdiction to order the defendants to allow the plaintiffs to inspect the documents.
 STANDARD OF REVIEW
The UAPA provides for a very limited scope of review for administrative appeals.[8] The court "must decide, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily or illegally, or abused its discretion." Rocque v. Freedom of InformationCommission, 255 Conn. 651, 658, ___ A.2d ___ (2001). This standard of review applies even as to questions of law. Id. "Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." Id. As to statutory interpretation, the courts "accord great deference to the construction given [a] statute by the agency charged with its enforcement." Id.
 DISCUSSION I GENERAL STATUTES § 1-210 (B)(1)
No one disputes that the documents that are the subject of this appeal are public records under § 1-210. The primary issue before the court, then, is whether, despite their status as public records, the requested documents are exempt from disclosure under § 1-210 (b) (1). That section provides that "[n]othing in the Freedom of Information CT Page 9140 Act shall be construed to require disclosure of [p]reliminary drafts or notes provided the public agency has determined that the public interest in withholding such documents clearly outweighs the public interest in disclosure." General Statutes § 1-210 (b)(1). Courts employ a two-part test to determine whether documents qualify for exemption under § 1-210 (b)(1). First, the court must decide whether the documents are preliminary drafts. Second, the court must determine whether the agency performed the balancing test required by § 1-210 (b)(1).
 A Preliminary Drafts
The Supreme Court has on three occasions interpreted the phrase "preliminary drafts or notes" in § 1-210 (b)(1). See Shew v. Freedomof Information Commission, 245 Conn. 149, 163-64, 714 A.2d 664 (1998);Van Norstrand v. Freedom of Information Commission, 211 Conn. 339,342-43, 559 A.2d 200 (1989); Wilson v. Freedom of InformationCommission, 181 Conn. 324, 330-38, 435 A.2d 353 (1980). First, the court has noted that the purpose of the exemption is helpful in understanding the meaning of the phrase. By exempting preliminary drafts and notes from disclosure, the legislature "sought to protect the free and candid exchange of ideas, the uninhibited proposition and criticism of options that often precedes, and usually improves the quality of, governmental decisions." (Internal quotation marks omitted.) Van Norstrand v. Freedomof Information Commission, supra, 211 Conn. 344 (holding that a summary, prepared by the speaker of the house, of data concerning judges who were not being considered for reappointment was a preliminary draft under the act.) "It is records of this preliminary, deliberative and predecisional process that . . . the exemption was meant to encompass." (Internal quotation marks omitted.) Shew v. Freedom of Information Commission, supra, 245 Conn. 165 (holding that documents created by an attorney who had been retained by the town of Rocky Hill to conduct an investigation of the town's police chief were preliminary drafts under the act). Second, the court has held that the concept of preliminary, as opposed to final, should not depend upon "whether the actual documents are subject to further alteration." (Internal quotation marks omitted.) Shew v.Freedom of Information Commission, supra, 245 Conn. 164. The court should instead inquire whether the documents "have an operative and direct effect upon [agency] policy or administration." Wilson v. Freedom ofInformation Commission, supra, 181 Conn. 332 (holding that recommendations, submitted for review to the vice president for academic affairs, for improving the efficiency of the university's academic departments constituted preliminary drafts under the act.)
Given the limited scope of review, this court cannot say that the CT Page 9141 FOIC's decision amounted to an abuse of its discretion. In fact, the FOIC followed its own precedent in holding that the requested documents at issue in this case constituted preliminary drafts. See Cohen v.Corporation Counsel, No. FIC 1998-204. (ROR, pp. 109-10.) (dismissing the plaintiffs' appeal, which sought disclosure of records pertaining to a proposed development project, and finding that the records of the public agency's proposed agreement with the developers of the project constituted preliminary drafts under General Statutes § 1-19 (b) (1)).
Even under a more rigorous standard of review, however, the court would still affirm the FOIC's decision. The documents at issue in this case clearly did not have "an operative and direct effect upon agency policy or administration," because UConn and Pfizer have since abandoned the project altogether. Instead, the documents here fall squarely within the category of preliminary drafts. Moreover, the drafts have not lost their preliminary nature because the project has been abandoned. The Supreme Court has made it clear that documents do not cease to be preliminary drafts merely because they are no longer subject to further alteration.Shew v. Freedom of Information Commission, supra, 245 Conn. 164.
 B Balancing of the Public Interest by the University
Even if documents are preliminary drafts under § 1-210 (b)(1), the FOIC may uphold an agency's decision not to disclose only if the commission found that the agency has "determined that the public interest in withholding such documents clearly outweighs the public interest in disclosure." General Statutes § 1-210 (b)(1). Specifically, the FOIC must find that the agency made its determination in good faith and that the decision was not an abuse of discretion. Van Norstrand v. Freedom ofInformation Commission, supra, 211 Conn. 345-46. The agency must, therefore, have indicated "the reasons for its determination to withhold disclosure and those reasons must not be frivolous or patently unfounded." (Internal quotation marks omitted.) Id., 345. Again, the court's scope of review on this issue is limited. It is clear, however, that in this case, the FOIC made the required finding. In its final decision, the commission finds that the defendants "have determined that the public interest in withholding such draft agreements clearly outweighs the public interest in disclosure, within the meaning of §1-210 (b)(1)." (ROR, p. 128). Further, during the June 2, 1999, hearing, Shapiro specifically testified that he considered the public interest in deciding to withhold the documents. (ROR, pp. 60-61.) "The issue is the ability of the State of Connecticut, and in this case the University of Connecticut, to negotiate an agreement or series of CT Page 9142 agreements with a third party without having various iterations and drafts circulated to the outside world. In the business world you simply has to throw proposals on the table, counter proposals, marked up proposals. . . . [W]e could not find anybody who would be willing to enter into a transaction with [the state] if the University or the State had to submit piecemeal draft, marked up, non final versions of contractual arrangements to a third party." (ROR, pp. 60-61.) Given this testimony, the FOIC correctly determined that the university's proffered reason satisfied the requirements of § 1-210 (b)(1) because there is no evidence that the university's determination was made in bad faith, nor that it was an abuse of discretion. In their post-hearing brief filed on April 27, 2001, the plaintiffs argue that the court should hold that the public interest balancing prong of § 1-210 (b)(1) is not met because the project has been abandoned since UConn made its determination that the public interest weighed against disclosure. The FOIC, however, has already determined this issue. The plaintiffs raised the issue of the project's abandonment both in their August 12, 1999, motion to reopen (ROR, p. 174) and in their exceptions to the proposed final decision. (ROR, p. 189.) Since the commission found, despite the project's subsequent cancellation, that UConn's weighing of the public interest satisfied the requirements of § 1-210 (b)(1), this court cannot, given the narrow scope of review, overturn the commission's decision, because it was not an abuse of discretion.
 II CONFLICT OF INTEREST
In their complaint, the plaintiffs allege that the FOIC acted illegally, arbitrarily and in abuse of its discretion in (1) failing to reopen the hearing for the purpose of providing Riess with the opportunity to disclose potential facts supporting her disqualification on grounds of conflict of interest hearing officer, commissioner Norma Riess, should have recused herself because she had an undisclosed conflict of interest; and (2) because Riess should have recused herself from the proceedings from the outset. Specifically, Riess did not disclose until October 18, 2000, that one of the members of UConn's board of trustees, John Downey, served on the Redding Republican Town Committee with Riess and was the treasurer of her campaign for second selectman in 1995.
The canons of judicial ethics for disqualifying a judge for bias or prejudgment do not apply to administrative hearing officers.Transportation General, Inc. v. Insurance Department, 236 Conn. 75, 76,670 A.2d 1302 (1996). "The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator." (Internal quotation marks CT Page 9143 omitted.) Clisham v. Board of Police Commissioners, 223 Conn. 354, 361,613 A.2d 254 (1992). "The test for disqualification has been succinctly stated as being whether a disinterested observer may conclude that [the hearing officer] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." (Internal quotation marks omitted.) Transportation General, Inc. v. Insurance Department, supra, 236 Conn. 77. Further, "[t]he applicable due process standards for disqualification of administrative adjudicators do not rise to the heights of those prescribed for judicial disqualification. . . . Such a rarefied atmosphere of impartiality cannot practically be achieved where the persons acting as administrative adjudicators, whose decisions are normally subject to judicial review, often have other employment or associations in the community they serve. . . . Neither the federal courts nor this court require a standard so difficult to implement as a prerequisite of due process of law for administrative adjudication." (Citations omitted; internal quotation marks omitted.) Jutkowitz v.Department of Health Services, 220 Conn. 86, 100, 596 A.2d 374 (1991). Initially, since the court has already found that the FOIC's final decision adopting Riess's report correctly applied the law, the plaintiffs cannot show that they have suffered any harm from Riess's alleged conflict. Secondly, even if the conflict exists, the plaintiffs have not demonstrated that Riess's association with Downey would lead a "disinterested observer" to conclude that Riess had "in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." Therefore, it was not an abuse of discretion for the commission to deny the plaintiffs' motion to reopen.
 CONCLUSION
Therefore, because the FOIC's decision to dismiss the plaintiffs' appeal was not an abuse of discretion, the court affirms the decision.
OWENS, J.